## J. C. Dicken, Appellant, *v.* David Winters and Daniel Winters.

*Replevin—Contract—Evidence—Competency of witness.*

On the 17th of November, 1892, R. confessed judgment to his wife, upon which execution was issued and the personal property of R. seized and sold by the sheriff. Among the property thus sold was a pair of bay horses, wagon and harness. Plaintiff, who was attorney for Mrs. R. in the writ, attended the sale, bid in the property for his client and paid the sheriff for the same, sometime subsequently taking from Mrs. R. as security for his advances, a bill of sale of all the property purchased for her. There was evidence tending to show that M., an employee of R., had been driving this team for some years before the sale, and desired to become the owner; that Mrs. R. favored this disposition of it; that M. attended the sheriff sale, and bid the price at which it was knocked down, but, by an arrangement with Mrs. R., it was returned as sold to her; that before the date of the bill of sale to plaintiff she agreed with M. that he should take the team at his bid, and pay for it as fast as he could out of the hauling he expected to do; that in pursuance of this agreement, M. took possession and thereafter paid a considerable part of the price in hauling for plaintiff, as agent for Mrs. R., and continued in possession of the team for seven months afterwards, when he suddenly died. At the time of his death, and for about three months before, he had kept the horses in the stable of defendants, for whom at times he did hauling. After M.'s death, plaintiff made demand on defendants for the horses, which was refused,

and thereupon he issued a writ of replevin. *Held*, (1) that plaintiff was incompetent to testify to a parol agreement between him and M.; (2) that evidence on the part of defendants that Mrs. R. or her agent exercised acts of ownership over the other personal property was admissible to show that no real transfer to plaintiff had been made; (3) that the incompetency of the widow of M. must be determined by what she attempted to testify to, and not because she was the widow of a deceased party in interest, and she was competent to prove her husband's handwriting; (4) that replevin could not be maintained against defendants as bailees of M., but the proper remedy was on the contract for the price of the team.

Argued Nov. 2, 1894. Appeal No. 231, Oct. T., 1894, by plaintiff, from judgment of common pleas No. 2 of Allegheny county, Oct. T., 1893, No. 119, on verdict for defendants. Before GREEN, WILLIAMS, MITCHELL, DEAN and FELL, JJ. Affirmed.

Action of replevin to recover possession of a team of horses. Before MAGEE, J.

The facts sufficiently appear in the opinion of the Supreme Court.

At the trial, J. C. Dicken, the plaintiff, being upon the stand, his counsel offered to prove by him that "Mr. Martin desired to have the use of the horses, and I made an arrangement with Mr. Martin that he might have the use of the horses in consideration of feeding them, shoeing them and taking care of them."

Counsel for defendants objected to the competency of the witness to testify to anything that occurred before the death of Mr. Martin between the witness and Mr. Martin, as affecting the title to this property as between Mr. Martin and the witness. Objection sustained, exception noted for plaintiff and bill sealed. [1]

Ellen J. Rynd, sworn on behalf of plaintiff. Counsel for defendants asked on cross-examination: "Q. What became of the horses you sent to Kensington, the ones you purchased here and sent to Kensington?" Objected to by plaintiff. Objection overruled, exception noted for plaintiff and bill sealed. "A. My attorney sold these horses to a gentleman here by the name of Mr. Steen." [2] "Q. What did you do with the horses?" Objected to by plaintiff's counsel because these are not the horses in controversy, and it is immaterial what she did with them.

Counsel for defendants propose to show that there is a bill of sale under which Mr. Dicken claims that he owns all the horses bought at this sale ; it is in evidence that two months after that Mrs. Rynd herself told him to send two of those horses up to her farm, and he sent them. Objection overruled and exception noted for plaintiff and bill sealed. "A. I sold them." [3]

By Mr. Day, counsel for plaintiff: "Q. I will read this bill of sale to refresh your memory.   (Mr. Day reads Exhibit No. 2.) Now I ask the question, after this sale was made, if you had no further interest in any of the material after that time, or in the results of the disposal of it arising from the disposition of it?"   Objected to by plaintiff's counsel as irrelevant and incompetent.   Objection overruled, exception noted for plaintiff and bill sealed.   "A. I think that I am interested in the result of the sale." [4]

C. H. Noble, a witness on behalf of plaintiff, was asked on cross-examination : "Q. Where was Mr. Rynd at that time?" Objected to as immaterial.   "Q. Well, Mr. Rynd wasn't in the city, was he ?"   Objection overruled, exception noted for plaintiff and bill sealed. [5]

Counsel for plaintiff offered in evidence Exhibits Nos. 1, 2 and 3.

Counsel for defendant objected to Exhibit No. 3, for the same reasons as stated at the time it was identified.

Objection to Exhibit No. 3 sustained, exception noted for plaintiff and bill sealed. [6]

Mrs. Jennie Martin, a witness called by defendants, was asked in her examination in chief: "Q. Mrs. Martin, do you know anything about his having bought a team of horses, a wagon and harness from Mrs. Rynd?"   Objected to, for the reason that it is not competent to contradict the sheriff's written bill of sale ; further than that, that this witness being the widow of Robert Martin, deceased, being the assignee in law of Robert Martin, is not a competent witness.

By the Court: "She cannot answer that—not what he said. The objection as to the incompetency of the witness is overruled, exception noted for plaintiff and bill sealed." [7]

Counsel for defendants offered in evidence Exhibit A.

Plaintiff objected that the account is not a proper subject

for a book of original entry; that this is not a book of original entry; that the witness has not testified that she saw Robert Martin make the entries in this book from day to day; that it is not competent to introduce these declarations of Robert Martin against the plaintiff in this case, Robert Martin being dead and the plaintiff having been excluded as a witness; further than that, that this does not show or tend to show the purchase of these horses from Ellen J. Rynd; that it is an account, if at all, between Mr. Noble and somebody named Dicken—whether J. Charles Dicken or not does not appear, or what Noble does not appear; that the account is unintelligible and no sum of indebtedness is thereon given, and it would be utterly impossible for the jury to understand what the account means if it means anything at all. It is further objected to as incompetent and irrelevant in this case because the plaintiff's case as made out is that Robert Martin was to have the use of this team, provided he paid for the keeping and shoeing of the horses, and that he had made considerable sums of money, as testified by Mr. Noble on the stand, for the hire of these horses.

Objection overruled, exception noted for plaintiff and bill sealed. [8]

Counsel for defendants renewed the offer of Exhibits B and C.

Objected to for all the foregoing reasons, except as to the matter of proof, viz: that Mrs. Rynd and Mr. Dicken had no notice of these insurance policies being taken out; that there is no proof that Robert Martin ever claimed title to these horses, or made a purchase of them from Mr. Dicken or Mrs. Rynd; that they do not tend to prove the ownership in Robert Martin, or purchase, and that the testimony is incompetent, irrelevant and immaterial.

Objection overruled, exception noted for plaintiff and bill sealed. [9]

David Winters, one of the defendants, being on the stand, was asked: "Q. Who did you have an arrangement with, if anybody?" Objected to by plaintiff. Objection overruled, exception noted for plaintiff and bill sealed. "A. I had arranged with Mr. Martin about the horses; he told me about working down there." [10]

D. W. Brown, a witness on behalf of defendants, was asked: "Q. Did you have any conversation with Mr. Noble in regard

to these horses with Mr. Rynd, and if so, what did he tell you?"
Objected to by plaintiff. Objection overruled, exception noted
for plaintiff and bill sealed. "A. He said he had been to see
Mr. Rynd and he inquired about Mr. Rynd's health, and he
said that Mr. Rynd asked him if Bob had got the team—'Bob,'
that was the way he always called Mr. Martin—and Mr. Noble
said that he told him that he had, and Mr. Rynd expressed
satisfaction at that and was very glad of it." [11]

Joseph Carson, a witness on behalf of defendants, was asked :
"Q. Do you know who those horses were bought in for at that
sale?" Objected to. "A. I do. Q. Who do you know it
from? A. I know it from Martin and Mr. Noble and Mr.
Brown, and those that were associated with him in their work
around the place. Q. You know it from Mr. Noble, Mr. Martin
and Mr. Brown, who was clerking there at the time. Now I
will ask the question ; don't answer it until you hear from me :
Knowing that fact, who were they bought in for?" Objected
to because the sheriff's record is the best evidence of who they
were bought for. Objection overruled, exception noted for
plaintiff and bill sealed. "Q. Who were they bought in for?
A. They were bought in for Mr. Martin ; he bid on them him-
self at the sale, and they were charged to the plaintiff."

By the Court: "Q. Was it on Mr. Martin's bid that they
were knocked down? A. I think so ; I wouldn't be positive
about that ; but I know the word was said, charge those to the
plaintiff, at that time, and the sheriff's clerk charged them to
the plaintiff at that time." [12]

By Mr. Day : "The purpose of this offer is this : Mrs. Rynd
has testified and shown here in evidence a transfer and sale of
all her property, on January 30, 1893, that she had purchased
at the sheriff's sale of B. F. Rynd, on Irvin avenue, in Alle-
gheny, including the leasehold of those premises, wagons, lum-
ber and leasehold of premises on Irvin avenue ; now I want to
say that she still held on and had an interest in the same, in this
very material that she had conveyed to Mr. Dicken, notwith-
standing Mr. Dicken says that this sale was made to him and
the transfer was made to him. I offer this paper for the pur-
pose of showing that Mrs. Rynd herself, on the 14th day of
February, 1894, sold and assigned this very lease to William
Creese & Co., limited. This, for the purpose of showing this

trapsfer to Mr. Dicken is without consideration and of no effect as to evidence in this case."

Objected to as incompetent and immaterial.

By Mr. Day: "And further for the purpose, I may add, of contradicting Mr. Dicken and Mrs. Rynd in the statements they made."

"Objection overruled, exception noted for plaintiff and bill sealed." [13]

Alexander Boyer, a witness on behalf of defendants, was asked: "Q. What, if anything, was said that evening by Mr. Noble in regard to those horses?"

By Mr. Hall: "Q. Was Mr. Dicken there? A. No, sir." By Mr. Hall: "If Mr. Dicken was there, we object."

Objection overruled, exception noted for plaintiff and bill sealed. [14]

Plaintiff presented the following point:

"Under all the evidence the verdict should be for the plaintiff. *Answer:* This point I refuse." [15]

The points presented by the defendants were as follows:

1. "If the jury believe from the evidence that the horses, wagon and harness in question were bid in at the sheriff's sale of the property of B. F. Rynd, on December 17, 1892, by J. C. Dicken, as attorney and agent of Mrs. Ellen Rynd, for Robert Martin, and the horses, wagon and harness were delivered into the possession of Robert Martin, in pursuance of that arrangement, then, although the purchase money had not been fully paid for the same, at the time of the death of Robert Martin, the plaintiff cannot maintain this action and the verdict should be for the defendant. *Answer:* This point is affirmed." [16]

3. "If the jury believe from the evidence that Robert Martin purchased the horses, wagon and harness, and the same were delivered into his possession prior to the claim of ownership by J. C. Dicken, to wit: January 30, 1893, and he retained the . same until his death, that, although Robert Martin did not pay the purchase money for the same, the plaintiff (that would be Mr. Dicken) cannot maintain this action of replevin and the verdict should be for the defendants. *Answer:* This point is affirmed." [17]

4. "If the jury believe from the evidence that Robert Martin purchased the horses, wagon and harness from Ellen J. Rynd,

through either C. H. Noble or J. C. Dicken, her attorneys and agents, prior to January 30, 1893, and possession of the same was given to Robert Martin prior to said date, and he kept possession of the same until July, 1893, the time of his death, then J. C. Dicken, who does not claim title until said January 30, 1893, cannot maintain this action of replevin and the verdict should be for the defendants. *Answer :* This point is affirmed." [18]

Plaintiff excepted to the general charge of the court, and bill sealed. [19.]

Verdict and judgment for defendants.

*Errors assigned* were (1–15) rulings on testimony; (15–18) answers to points as above, quoting them ; (19) charge of court.

*J. Charles Dicken* and *William M. Hall, Jr., William C. Dicken* with him, for appellant.

*T. Walter Day,* for appellee, cited, Harris v. Smith, 3 S. & R. 20.

OPINION BY MR. JUSTICE DEAN, July 18, 1895 :

One B. F. Rynd, a lumber dealer in Allegheny, being owner of a large amount of personal property, on 17th of November, 1892, confessed judgment to his wife, Ellen J. Rynd, for over $8,000. Execution was issued on the judgment, and the personal property of Rynd seized and sold by the sheriff. Among the property thus sold were a pair of bay horses, wagon and harness. Mr. J. C. Dicken, attorney for Mrs. Rynd in the writ, attended the sale, and from the sheriff's return was the purchaser for his client of the bay horses, wagon and harness, along with considerable other property, for all of which he paid the sheriff. Mr. Dicken having advanced for his client a considerable sum of money in the purchases for her of her husband's property, both in Allegheny and Westmoreland counties, on 30th of January, 1893, he alleged he took from her, as security for his advances, a bill of sale of all the property purchased by him. This bill does not specifically mention this pair of horses and wagon, but does state, that it includes all

the property purchased by him for Mrs. Rynd at the time and place the team was sold. So far as shown by the sheriff's return and this bill of sale, the team is the property of Mr. Dicken. But there was evidence tending to show, that one Robert Martin, an employee of Rynd, had been driving this team for some years before the sale for Mr. Rynd, and desired to become the owner; that Mrs. Rynd favored this disposition of it; that Martin attended the sheriff's sale, and bid the price at which it was knocked down, but, by an arrangement with Mrs. Rynd, it was returned as sold to her; further, that soon after, and before the date of bill of sale to Dicken, she agreed with Martin he should take the team at his bid, and pay for it as fast as he could out of the hauling he expected to do; that in pursuance of this agreement Martin took possession, and thereafter paid a considerable part of the price in hauling to Dicken, as agent for Mrs. Rynd. Martin continued in possession of the team for seven months afterwards, when he died suddenly. At the time of his death, and for about three months before, he had kept the horses in the stable of defendants, for whom at times he did hauling. A few days after Martin's death, plaintiff made demand on defendants for the horses; this was refused, and thereupon plaintiff issued a writ of replevin; defendants claimed the property as bailees of Martin, and gave a property bond; the issue, as made up by the pleadings, was to determine whether Dicken or Martin was the owner. The court submitted that question to the jury on the evidence; there was a verdict and judgment for defendants, and plaintiff brings this appeal, preferring nineteen assignments of error to the charge of the court and rulings on offers of evidence.

1. The plaintiff himself offered to testify to a parol agreement between him and Martin. This was objected to, because Martin, of whom defendants claimed to be bailees, was dead. The witness was not competent; he was the adverse claimant of record; Martin's right of possession had passed to defendants by his act; whatever may have been the character of that possession, whether that of a purchaser from or as a mere bailee of plaintiff, the very question in dispute would be determined by the terms of a verbal contract to which the survivor, Dicken, alone offered to testify.

2, 3 and 4. The plaintiff claimed possession of the team

under a bill of sale from Mrs. Rynd, dated 13th of January, 1893; the defendants, under an absolute sale to Martin by her on 17th December, 1892. The bill of sale to plaintiff embraced, as he claimed, not only this team, but others, and much other personal property. The defendants offered evidence tending to show that after the 30th of January, Mrs. Rynd treated the property, still, as her own, by moving and disposing of it; this for the purpose of showing that there was no real transfer of property to plaintiff, and that he had no right of possession, which made defendants guilty—as to him—of a tortious detention of this team. If defendants could have shown that they did not wrongfully detain Dicken's team, then he suffered no damage, and could not recover. The evidence was admissible.

5. Defendants offered evidence of declarations of C. H. Noble. It was not denied that he was the brother of Mrs. Rynd, and within certain limits, by her authority, acted both as her agent and agent for plaintiff in this and other business transactions. What, as agent, he said in the management of this transaction with Martin and defendants, was evidence, and there was no error in admitting it.

6. Plaintiff offered a bill for feed made out by Levi and Sons, which was properly rejected. It was not made out against Dicken, but against Mrs. Rynd and Noble, her brother, and antedated the bill of sale to Dicken. It was wholly irrelevant, because it tended to prove nothing one way or the other.

7. The widow of Martin was called to the stand; the plaintiff objected to her as incompetent; this objection was not sustained, the court correctly holding, that her incompetency must be determined by what she attempted to testify to, and not because she was the widow of a deceased party in interest. She was not permitted to testify to any declaration of her husband; she did state, her husband had this team in his possession at his death and for months before; but this did plaintiff no harm, because he had averred and proved it before she was called to the stand; he alleged it was a bailment or conditional sale to Martin; Mrs. Martin was not permitted to testify to the contrary.

8 and 9. Martin was an illiterate teamster; he had, in his rude way, kept a memorandum of work done for J. Charles

Dicken and Charles Noble; on the inside cover it was headed: "Bob Martin's time book," and showed, day by day, with dates and day of the week, from January, 1893, to April of the same year, hauling and work done to the amount of $203. The defendants had offered evidence, tending to show that he was to pay Mrs. Rynd for the team by hauling with it; Dicken was her agent and attorney; Noble was her agent; defendants offered to prove by Martin's widow, that this book was in his house when he died; that it was in her husband's handwriting, and that she had seen him write in it. The book was then offered, and admitted as a book of original entries tending to establish part payment under Martin's contract with Mrs. Rynd. It was objected to, because the charges were not the subject of book entry, and further, because not sufficiently proven. The charges of time were the subjects of book entry, if made at or about the time the work was done. The appearance of the book itself was some indication of the method of keeping it; it was subject to the inspection of the court in the first instance, by whom it could have been excluded if suspicious in character, or if the entries were not what the law deemed original entries; if admitted, then the value and reliability of the book as a book of original entries were for the jury. The party who made the entries being dead, his handwriting could be proven by his widow. The fact that the charges were against the agents of Mrs. Rynd, instead of against her, did not render the book inadmissible; that was a fact wholly for the jury in determining the weight to be given to it. Under the circumstances, there was no error in admitting the book.

9. The same witness, Mrs. Martin, testified that two policies in a Live Stock Insurance Company, issued to Robert Martin on two geldings, "Dick" and "Ben," were in the possession of her husband when he died; this was followed by the testimony of the insurance agent that he delivered the policies to Martin, and received from him the monthly assessments. The admission of the policies was objected to by plaintiff, because there was no evidence that either he or Mrs. Rynd had any notice that they had been issued. Of themselves, the policies would not show ownership of the horses, but taken in connection with other evidence in the case, especially that of plaintiff offered to show that Martin did not claim the horses as his

property, they, to some extent, were an assertion of ownership in the horses, as opposed to a mere bailment, as plaintiff claimed. We think the court was right in admitting it.

10. While the offer, here, was, in substance, to prove declarations of Martin to Winters, which were not admissible, and the objection of plaintiff was overruled, yet, when the witness testified, he was not permitted to make any objectionable statement, except one, which was not in response to the question put, but this was immediately stricken out by direction of the court. While the ruling at first was error, no incompetent testimony reached the jury as the result of it, and plaintiff was not harmed.

11. This assignment is based on this incident: Mr. Rynd was in Philadelphia; Noble went to see him, and inquired as to his health; Rynd asked if "Bob," meaning Martin, had got the team; Noble said he had. Rynd said he was very glad of it. Defendants then proved by a witness, that Noble, on his return, repeated this conversation to him; plaintiff objected to any evidence of Noble's conversation with Rynd. It ought to have been excluded, if for no other reason, than because it was wholly immaterial what Rynd said to Noble; but the court admitted it, and the ruling is here gravely assigned for error. Both plaintiff and defendants proved Martin got possession of the team soon after the sheriff's sale, and kept it until his death. A man having no pecuniary interest in the matter said he was glad of it. The palpable inconsequence of this assignment calls for no further notice.

13. The offer of the assignment of the lease by Mrs. Rynd, after the date of the bill of sale, and which was objected to by plaintiff, was admissible, because it tended to show her continued ownership in and control over the property embraced in the alleged sale; besides, the evidence affected the credibility as witnesses of both herself and Dicken.

14. Noble, the brother of Mrs. Rynd, and agent for her and Dicken, called upon Winters the evening of Martin's death, and directed Winters to retain the horses, as Martin had not yet paid either Mrs. Rynd or Dicken for them. Evidence of this was objected to by plaintiff, because Dicken was not present; the court admitted it; when it is remembered, that from the date of sheriff's sale down to the commencement of the

suit, Noble was acting for Dicken and Mrs. Rynd in this business, the relevancy and competency of this testimony are so obvious that nothing further need be said to justify the ruling of the court.

The 16th, 17th, 18th and 19th assignments are to the charge generally, and answers of court to defendants' points. In effect, the points asked the court to instruct the jury, that if they believed from the evidence the property was purchased by Mrs. Rynd at sheriff's sale for Martin, under an agreement that he was to have it at the price bid, and after it was knocked down, in pursuance of this agreement, it was delivered to Martin, and he kept possession of it as his own until his death, then, even though he had not paid for it to Mrs. Rynd, the title and right of possession were in Martin, and replevin could not be maintained against his bailees, the defendants. The court affirmed the points, and so instructed the jury in the general charge. This is clearly the law. If the sale to Martin was absolute, and possession was taken by him in pursuance of it, the plaintiff's remedy was not in tort, but on the contract for the price.

15. This alleges error, because the court refused peremptory instruction for the plaintiff. What we have already said disposes of it.

The evidence throughout was conflicting; it was for the jury to find the truth from it; the court, in a charge entirely impartial, submitted it to them. While the assignments of error are many, we find nothing of merit in any of them. The judgment is affirmed and appeal dismissed.